## FOX PETROLEUM CO. et al. v. BOOKER et al.

No. 16597—Opinion Filed June 1, 1926.

Rehearing Denied Feb. 22, 1927.

1. **Evidence—Oral Negotiations Presumed Merged in Oil and Gas Lease.**

The statutory rule that previous and contemporaneous oral negotiations are conclusively presumed to have been embodied in the written contract between the parties, except for accident, fraud, or mistake of fact, is applicable to oil and gas leases.

2. **Oil and Gas—Implied Covenants to Develop—When Operative Within Fixed Term.**

The implied covenants in an oil and gas lease for further exploration and development after the discovery of oil or gas are operative within the fixed term as well as when the lease is held thereafter under the production clauses.

3. **Same — Diligence in Operation—Rule Stated.**

Neither party to an oil and gas lease is the arbiter of the extent to which, or the diligence with which, operation thereunder shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of an operator of ordinary prudence, having due regard for the interest of both.

4. **Same—Duty to Test and Develop—When Implied.**

The lessee is under two duties—to test and to develop—which will be implied unless the matter is expressly covered by the contract.

5. **Same—Implied Covenant—Initial Well—Further Development—When Financial Result Considered.**

The financial return of the enterprise is not to be considered where the implied covenant is to drill the initial well. It is only in the development of the land already test-

ed, and in cases involving protection against drainage, that the probable financial result, under implied covenant, becomes material.

**6. Same—Equity May Decree Cancellation Regardless of Forfeiture Clause.**

Equity may decree the cancellation of an oil and gas lease in whole or in part where such cancellation will effectuate justice, without regard to whether the lease contains a forfeiture clause.

**7. Same—Implied Covenants — Breach by Lessee—Three Remedies of Lessor Stated.**

Where the implied covenants to test or further develop have been breached, the lessor may, according to the circumstances of the case, invoke these remedies in equity; declare forfeiture and sue to quiet title treating the implied covenant as an implied condition; elect to treat the lease as still in force and effect and sue to cancel same for inadequacy of legal remedy; sue to cancel the lease as a cloud upon his title for abandonment of the lease or of its purposes.

**8. Same—Implied Covenants Are Also Implied Conditions.**

Implied covenants are also implied conditions for the violation of which equity may decree cancellation of the lease in whole or in part.

**9. Same—Lease—Abandonment of Enterprise Abandons Estate in Land.**

An oil and gas lease contemplates a mining enterprise, and the estate granted the lessee is for the purpose of effectuating and is incidental to the enterprise, so that the lessee cannot retain the estate after abandoning the enterprise.

**10. Same—Abandonment of Purposes—Cancellation.**

Where an oil and gas lessee abandons the objects and purposes of the lease, equity will cancel the lease as a cloud on lessor's title.

**11. Same—Abandonment of Part of Producing Lease.**

The lessee may abandon the objects and purposes of part of a lease although he may be producing oil or gas from the remainder.

**12. Same—Abandonment—How Inferred.**

Intention to abandon may be inferred from the acts and conduct of the lessee as well as from his express declarations.

**13. Same—Actual Relinquishment of Property not Essential to Abandonment by Lessee.**

The rule that there must be a concurrence of intention to abandon and an actual relinquishment of the property in order to effectuate an abandonment as applied to phys-

ical property, has no application to abandonment of intangible rights created by an oil and gas lease where the lessee acquires no title to the minerals.

**14. Same — Judgment Canceling Lease not Sustained.**

Record examined, and held that the judgment of the court is clearly against the weight of the evidence on the issues of breach of implied covenants to develop and on abandonment.

(Syllabus by Estes, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Carter County; W. F. Freeman, Judge.

Action by D. E. Booker and J. M. Miller against Fox Petroleum Company and Humble Oil & Refining Company. Judgment for plaintiffs, and defendants appeal. Reversed.

Dolman & Dyer and Hefner & Johnson, for plaintiffs in error.

Brett & Brett and R. A. Howard, for defendants in error.

Opinion by ESTES, C. This action was instituted by the defendants in error against the plaintiffs in error to cancel an oil and gas lease as to 100 acres of the original 160 covered by the lease. The parties will be hereinafter referred to as they appeared in the court below.

The lease in question was executed January 31, 1919, and demised the land (for a term of five years "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee") "for the sole and only purpose of mining and operating for oil and gas," etc. This lease contained no "forfeiture clause" and no "drilling clause." At the time of its execution there was on the land a gas well which had been drilled under a former lease concerning which there seems to have been some controversy. The new lease provided for one-eighth of the gas as royalty instead of $50 per year per well, as provided in the former lease.

After the execution of the second lease, the lessees drilled four additional wells, none of which were on the 100 acres sought to be canceled out. These wells were all producers but the production was not great. The last of these wells was completed in June, 1923. This action was commenced February 2, 1924, just two days after the expiration of the fixed term of five years. The journal entry recites:

"And from said special findings, the court finds that the defendants have not diligent-

ly developed and operated the 100 acres of land described in said special finding No. 14. And that by reason of the negligence and the breach of covenant, both expressed and implied, to diligently develop and operate the 100 acres of land for oil and gas, that the forfeiture and cancellation of the lease of the defendants, in so far as it affects said 100 acres, will effectuate justice."

Thereupon, the court decreed cancellation of the lease as to the undeveloped 100 acres, and left the lessees with 60 acres around their wells. It is urged for reversal that the trial court erred in admitting testimony concerning an alleged oral drilling agreement at the time of the execution of the second lease, and that the decree is contrary to the weight of the evidence.

1. The court, over the objection of defendants, admitted testimony tending to show an express oral agreement, contemporaneous with the written lease, that defendants would diligently develop by drilling wells on the 100 acres in controversy. From the findings of the court, we take it that the judgment was, at least, in part based upon such testimony. This was error. That previous and contemporaneous oral negotiations are conclusively presumed, as provided by statute, to have been embodied in the written contract, in the absence of accident, mistake of fact, or fraud, is applicable to an oil and gas lease. Ohi-Okla Oil & Gas Co. et al. v. Shertzer, 105 Okla. 111, 231 Pac. 877. The rights of the parties herein must be determined by the express terms and implied covenants of their written lease. The cause being in equity, our duty is to consider and weigh the evidence to determine whether the judgment of cancellation is clearly against the weight thereof. If the implied covenants to diligently develop this lease have been breached, or if the evidence, under said rule, discloses an intent to abandon the lease as to said 100 acres, the judgment should be affirmed.

2. Since this suit was brought just two days after the expiration of the fixed five-year term, it is obvious that any breach of implied covenants must have occurred within the term, and it becomes necessary to determine whether the covenant for further development has any application within the fixed term of the lease. That it does so apply seems to have been recognized in Indiana Oil, Gas & Development Co. v. McCrory, 42 Okla. 136. 140 Pac. 610; Cotner v. Mundy, 92 Okla. 268, 219 Pac. 321; Donaldson v. Josey Oil Co., 106 Okla. 11, 232 Pac. 821; Howerton v. Kansas Nat. Gas. Co., 81 Kan. 553, 106 Pac. 47; 82 Kan. 367, 108 Pac. 813,

34 L. R. A. (N. S.) 34; Dinsmoor v. Combs, 177 Ky. 740, 198 S. W. 58. It is specifically so decided in Daughetee v. Ohio Oil Co., 263 Ill. 518, 105 N. E. 308; and it is a fair inference from Texas Co. v. Davis, 113 Tex. 321, 254 S. W. 304; Robinson v. Jacobs, 113 Tex. 231, 254 S. W. 309; Munsey v. Marnet Oil & Gas Co., 113 Tex. 212, 254 S. W. 311. The recent helpful work, Mills-Willingham on Oil and Gas, page 155, states:

"It has been contended that this covenant does not operate during the fixed term of the lease; that upon the drilling of a producing well, the lessee is under no obligation, during the fixed term, to further develop, because the parties have agreed upon the diligence to be exercised. It is not believed, however, that this is the true rule. The fixed term is intended as a period of exploration and determination of the capacity of the land for producing; not as a period of development. Upon discovery, the lease is automatically changed from one for years into one that shall endure as long as oil or gas is produced. The acceptance of rentals extends the lease for another year and defers the drilling of the first well, not the development of the lease, after discovery of oil or gas. Upon both reason and authority, the implied covenant for development operates both during and after the fixed term, after discovery of oil or gas."

See, also, the late case of Webb v. Croft et al. (Kan.) 244 Pac. 1033. In this particular lease, however, there was no drilling clause and a gas well was already on the property when the lease was made. In such case, it is difficult to assign any meaning to the five-year term which would exclude the operation of the implied covenant for exploration and development within the term. In our opinion, the covenants were in operation.

3. While all courts are agreed that the lessee is under certain implied obligations with reference to the development of the leased premises (aside from protection against drainage), there is confusion as to the nature of these obligations. This court is committed to the doctrine that neither party is the arbiter of what is reasonable diligence. And it is sometimes said that the lessee is bound to proceed if there is reasonable ground for supposing that the entire operation, including the cost of drilling, would be profitable. Indiana Oil, Gas & Development Co. v. McCrory, supra; Pelham Petroleum Co. v. North, 78 Okla. 39, 188 Pac. 1069; Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213.

4, 5. It is to be observed, however, that the lessee is under two duties, which will

be implied unless the matter is expressly covered by the contract, namely: to test and to develop. Those cases which have involved the implied covenant to drill the initial well have not considered the probable financial return of the enterprise as having anything to do with the obligation. Hitt v. Henderson et ux., 112 Okla. 194, 240 Pac. 745; Cole v. Butler, 103 Kan. 419, 173 Pac. 978; Tenn. Oil, Gas & Mineral Co. v. Brown, 131 Fed. 696, 65 C. C. A. 524; Calhoun v. Neely (Pa.) 50 Atl. 967, 21 M. R. 754; Mansfield Gas Co. v. Alexander, 97 Ark. 167, 133 S. W. 837. Probably it would be safe to say that the reason no such test has ever been applied is because the lessee knew the character of the enterprise when he took the lease and assumed the obligation. And those cases which have considered the obligation of the lessee where the initial well is dry, or where it has ceased to produce (except where affected by an express provision), have uniformly considered that the lessee will have a reasonable time for further testing of the premises, and that, failing to do so, the lease will be considered forfeited or abandoned. In these cases the probable financial return is not considered. Venture Oil Co. v. Fretts (Pa.) 25 Atl. 732, 17 M. R. 543; Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107, 19 M. R. 315; Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va. 583, 42 S. E. 655, 59 L. R. A. 566; Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; Texas Co. v. Davis, supra; Robinson v. Jacobs. supra; Munsey v. Marnet Oil & Gas Co., supra; Chapman v. Ellis (Tex. Civ. App.) 254 S. W. 615; Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555, 74 A. S. R. 696, 20 M. R. 177. It is only in connection with the development of land already tested, and in cases involving protection against drainage, that the probable financial result is of importance. Examples of this type are to be found in Pelham Petroleum Co. v. North, supra; Ind. Oil, Gas & Development Co. v. McCrory, supra; Brewster v. Lanyon Zinc Co., supra; Manhattan Oil Co. v. Carroll, 164 Ind. 526, 73 N. E. 1084. Now, when the lease covers two tracts of land some distance apart, as in Alford v. Dennis, 102 Kan. 403, 170 Pac. 1005, or a very large tract. as in Brown v. Union Oil Co., 114 Kan. 166. 217 Pac. 286. 114 Kan. 482, 218 Pac. 998, it would probably be true that drilling on one portion of the leased premises would have little bearing in testing or determining the productivity of other portions. On the other hand, where the leased tract is compact and of small area, wells on one portion of the lease do, to some extent, operate

as a test of the entire area for the depth drilled. The statement that the implied covenant for further operations is limited to cases where there is likelihood of profit to the lessee, must be taken in a restricted sense, and is not of universal application. It will depend upon the facts and circumstances of the particular case.

6. It is well established in Oklahoma that a court of equity may cancel part of the lease and leave the remainder in force where such disposition of the latter will promote justice. Pelham Petroleum Co. v. North, supra; Papoose Oil Co. v. Rainey, 89 Okla. 110, 213 Pac. 882; Carder v. Blackwell Oil & Gas Co., 83 Okla. 243, 201 Pac. 252.

7. When the implied covenant is breached by the lessee, the ultimate loss of the lease to him comes in one of three ways: First, the lessor may, in a proper case, declare the lease forfeited and come into a court of equity and have his title quieted. The application of this doctrine depends upon the express reservation of a forfeiture clause, or the treating of the implied covenant as an implied condition. Brewster v. Lanyon Zinc Co., supra. The second method of procedure recognizes the lease as still in force and asks that equity cancel all or a portion of the lease because there is no adequate remedy at law available to the lessor. Blackwell Oil & Gas Co. v. Whitesides, 71 Okla. 41, 174 Pac. 573. As a corollary of this doctrine we have certain courts, notably Kansas, entering what is known as the alternative decree for specific performance of the implied covenant or forfeiture. In theory, this method of procedure is available in the absence of an express forfeiture clause, and without considering the implied covenant as an implied condition. Alford v. Dennis, supra; Howerton v. Kansas Nat. Gas. Co, supra; Klepner v. Lenon, 176 Pa. 502, 35 Atl. 109, 198 Pa. 581, 48 Atl. 483. The third method of procedure is based upon the theory of abandonment. When the lessee has abandoned the purposes of the lease, equity will cancel the lease as a cloud on lessor's title. Hitt v. Henderson, supra; Cotner v. Mundy, supra; New State Oil & Gas Co. v. Dunn, 75 Okla. 141, 182 Pac. 515; Highfield v. Kirk (Pa.) 93 Atl. 815.

8. It will be observed that the lease in question contains no forfeiture clause, and in this respect differs materially from the lease involved in Brewster v. Lanyon Zinc Co., supra, where the forfeiture clause was construed to extend to the implied as well as to the express covenants. Were the question before us for the first time we might

be inclined to hold that since no forfeiture clause was expressed, none would be implied. Otherwise stated, we might not regard the implied covenant as an implied condition. Thus, Texas, West Virginia, and Pennsylvania do not consider the implied covenants as implied conditions, and, refusing cancellation, leave the lessor to his remedy in damages except in cases of abandonment. But in several cases, this court has apparently discounted the importance of an express forfeiture clause. In Indiana Oil & Development Co. v. McCrory, supra, there was no forfeiture clause. In Blackwell Oil & Gas Co. v. Whitesides, supra; Pelham Petroleum Co. v. North, supra; Papoose Oil Co. v. Rainey, supra; Wapa Oil & Development Co. v. McBride, 84 Okla. 184, 201 Pac. 984, there were either no forfeiture clauses, or they were not considered of sufficient importance to mention in the opinion. All these cases were based upon Brewster v. Lanyon Zinc Co., supra, but they apparently go further. So in Mills-Willingham, Law of Oil & Gas, page 167, it is said:

"While those states, which hold that the lease may be forfeited for a breach of the implied covenants, apparently base their decision upon the proposition that the forfeiture clause in the lease applies to both the express and implied covenants, it is, in effect, based upon the inherent power of equity to decree a cancellation. If it were based upon the condition of forfeiture specified in the lease, there would be a forfeiture, ipso facto, upon the breach of any of the implied covenants, and the jurisdiction of a court of equity, under such circumstances, could be invoked only for the purpose of quieting title, or by the lessee, for the purpose of relieving himself from the forfeiture. The courts, however, have in no manner restricted their jurisdiction to such purposes, and have generally exercised their equitable power to effectuate justice, according to the equities of the particular case. In Oklahoma at least, the rule has been followed from the first, that equity will exercise its right of forfeiture only in the interest of justice."

This seems to have been the conclusion reached by this court in Cotner v. Mundy, supra. Our conclusion drawn from the cases is that this court has taken the position that the implied covenants are also implied conditions, for breach of which a court of equity may, in a proper case, decree cancellation of the lease in whole or in part.

The record presented in this case, so far as it pertains to the application of the implied covenant for further development, is not satisfactory. Does the evidence under the equity rule as to quantum, establish breach of implied covenant to develop the 100 acres? The following plat shows the situation of the property:

The plaintiffs appear to have considered their case complete when they showed that five wells had been drilled upon the property, all of which produced oil or gas; that no dry holes had been drilled; that no effort had been made to develop the 100 acres, all the wells being on the 60 acres, and that six months had elapsed since the completion of the last well. On the other hand, the lessees seem to have considered that they made out a complete defense by showing that they had expended $241,851.27 on the lease, and that the receipt from the lease for oil and gas had been $120,353.24; that the cost of drilling wells in this field was from $25,000 to $35,000, with an additional expense of $6,000 or $7,000 for equipment, and that a dry hole had been drilled just north of the northeast corner of this 100 acres, and another dry hole to the southeast, and that it was considered that the 100 acres was condemned. In addition, the defendants offered the opinion evidence of A. M. Hepler, who testified that he was the superintendent of the Humble Oil & Refining Company; was partially in charge of the lease in question; had been engaged in the oil and gas business for more than 25 years, and had had experience in the drilling and operation of oil and gas wells; who stated that in his opinion a well 2,300 feet deep, costing $35,000, and producing 15 barrels a day, was not a paying well; and, in addition, that, in his opinion, there was no likelihood of production in paying quantities, and that the entire lease had not been paying.

There is a lack of testimony really calculated to advise the court concerning conditions. The conclusion given by the bookkeeper for the Fox Petroleum Company, that the lease shows a loss of $121,498.03, which is a difference between the amount expended and the return, is of no value whatever without some explanation of how the figures were reached. On the contrary, one might reasonably assume that the $121,000 represents the capital invested in the lease, which had not yet been returned by the production. One might also assume that the capital is represented, among other things, by equipment having considerable salvage value. even if no further oil should be produced by the lease. Likewise, Hepler's conclusion that the entire lease was not paying. is a conclusion based on facts not in evidence. and therefore of no value to the court. Moreover, his conclusion that a 2,300-foot well, costing $35,000 and producing 15 barrels per day. is not a paying well, is of very little value because, although evidently directed at well No. 5, there is no testimony in the record as to the amount of oil produced from No. 5; that at the time the suit was instituted, No. 5 was producing about 15 barrels per day, although on cross-examination it developed that the initial production of No. 5 was about 40 barrels per day.

Neither side has favored the court with any facts concerning the thickness and productivity of the various sands, or the probable life of the wells that have already been drilled, or the territory likely to be drained by a well, the cost of operating these wells, and but little that would assist the court in determining whether a prudent operator, having in mind the interest of both the lessor and lessee would invest further capital in the developing of this property. In fact, the evidence tends to the conclusion that more wells to the east would have secured only negligible production.

And if the obligation of the lessees be viewed as one for exploration, rather than development (and so, perhaps, not affected by the possibility of financial return), the evidence still fails to establish want of reasonable diligence in exploration. When this suit was filed, some six months had elapsed since the completion of the last well. Under the facts and circumstances presented by this record, considering the fact that the wells already drilled on the 60 acres were to a certain extent an exploration of the entire tract, it does not appear that the delay was unreasonable. The burden was on plaintiffs to establish the breach of the implied covenants, and it was not sustained.

9, 10. It remains therefore for us to inquire whether the weight of the evidence sustains the judgment on any other theory. This brings us to the very serious question, whether the evidence shows an abandonment by the lessees of the object and purpose of the lease. so far as the 100 acres are concerned. Although the implied covenants were not already breached by actual acts of commission or omission, yet there might have been anticipatory breach by reason of a disclaimer by the lessees of any intention to perform.

An oil and gas lease contemplates a mining enterprise for the mutual benefit of lessor and lessee. In Mills-Willingham on Oil and Gas, p. 166, it is stated:

"The question whether, in any case, the lease has been abandoned depends upon the intention of the lessee. But this intent is to be determined by his attitude towards the enterprise as a whole. He might intend to

hold the land itself, without any intention of proceeding to test the premises for oil and gas; but having abandoned the purpose of the lease, he will be held to have abandoned the land which was granted as an incident of the enterprise."

In Brown v. Willmore Coal Co., 153 Fed. 143, 82 C. C. A. 295, it is said:

"While the question (of abandonment) is one of intention mainly, its decision does not depend upon an intention to abandon or retain the mineral right alone, divorced from the obligations which adhere to it under the contract, but the intention to abandon the contemplated enterprise."

In Robinson v. Jacobs, supra, it is said:

"Thompson granted nothing save for purpose of mineral exploration and production. * * * Abandonment of the enterprise, which it was the sole object and purpose of the grant to accomplish, would necessarily end the estate created by the grant."

We think that the later decisions of this court justify the conclusion that the lessee cannot abandon the purpose of prospecting the leased premises without also abandoning the lease. Hitt v. Henderson; New State Oil & Gas Co. v. Dunn; Cotner v. Mundy, supra.

11, 12. In considering the question of abandonment, there is presented squarely the question whether the lessee having production on part of a lease can continue to hold the entire lease and at the same time disclaim any obligation to test or develop the remainder of the land on the ground that it is condemned property. This rule seems to be sustained in Donaldson v. Josey Oil Co., supra. Highfield v. Kirk, supra, and Dinsmoor v. Combs, supra, present facts for comparison with the case at bar. In Highfield v. Kirk, the lessees had drilled 16 years before, and were still pumping one small well on a 45-acre tract. When sued for cancellation, they answered that further drilling would be unprofitable. The court considered that the 16-year interval, taken in connection with the declared intention of the lessees to drill no more wells on the tract, because the amount of profitable production would not justify the expense, was conclusive evidence of the abandonment of the property except as to that portion tributary to the producing well. It was considered that the attitude of the lessees, as disclosed by their answer and evidence, made a case which presented something more than a mere difference of opinion between lessor and lessee as to the reasonableness of further operation. The lessees having abandoned the purposes of the lease as to

the undeveloped territory, retention of that territory could not be for purposes of production, and the undeveloped portion of the lease was ordered canceled as a cloud on the lessors' title. It has been repeatedly held, that when by a dry hole it is demonstrated that the premises are unproductive, the lease is abandoned unless the lessee proceeds with further operations. Steelsmith v. Gartlan, supra; Parish Fork Oil Co. v. Bridgewater Gas Co., supra.

Our conclusion, from a careful study of the cases on abandonment, is that there can be an abandonment of the whole lease by the lessee, based upon an intention to abandon, so there can also be an abandonment of a portion of the lease. Further, an unreasonable delay on the part of the lessee in the further exploration of the premises, plus the lessee's declaration that further drilling would be unprofitable, is evidence from which the intention to abandon the operation and purpose of the lease as to the undeveloped portion may be inferred. Abandonment is largely a question of intention, but the intention of the lessee may be inferred from his acts and conduct as well as from express declarations. Parish Fork Oil Co. v. Bridgewater Gas Co., supra. If this 100 acres were to remain undeveloped and unprospected, there was no object in retaining it under the lease. Alford v. Dennis, supra.

The principle, as we understand it, is that development of every part of the lease is an implied condition. Therefore, whether the undeveloped portion be a single tract remote from the rest, or a considerable portion of a very large tract, or a deeper stratum, the existence of which may be doubtful, or the east 100 acres of a tract of 160, it is an implied condition that the lessee will test every part. When he abandons all further testing, and disclaims any obligation to test, he may be required likewise to surrender all claim to the property.

It may be said that the lease is an entire contract; but this lease, like most leases, itself provides for a subdivision. Moreover, the numerous cases in which this court has sanctioned cancellation of a part of the lease bear witness to the severability of the rights and obligations created by the instrument. The cases rest upon the proposition that a lease is a contract for production in which both lessor and lessee are interested. The rights in the land are granted to the lessee as incidental to the contract and to effectuate its purposes. Consequently, where the lessee abandons all intention of going further, the reason and purpose of

the grant ceases. Thus, an easement is extinguished where the reasons and purposes for which it is created have ceased. Weston v. Whittaker, 102 Okla. 95, 226 Pac. 1034.

13. The rule that there must be a relinquishment, as well as an intent, to abandon, obviously applies to physical property and has no application to abandonment of the intangible rights created by an oil and gas lease where the lessee acquires no title to the mineral. And whether the lease is an incorporeal profit a prendre, as was said in Rich v. Doheghey, 71 Okla. 204, 177 Pac. 86, or (by reason of the wording of the granting clause) a corporate estate, as was suggested in Nicholson Corporation v. Ferguson, 114 Okla. 10, 243 Pac. 195, it is equally susceptible of abandonment. It is true that in the Blackwell Oil & Gas Co. v. Whited, 81 Okla. 45, 196 Pac. 688, it is said that:

"To constitute abandonment in respect to property, there must be a concurrence of intention to abandon, and an actual relinquishment of the property, so that it may be appropriated by the next comer."

But we think this statement was broader than the circumstances of that case would warrant, and that it is inapplicable to oil and gas leases generally.

This brings us to the question whether the weight of the evidence in this case establishes such abandonment. The trial court made no specific finding of abandonment. The lessee did, not as in Highfield v. Kirk, expressly plead that the undeveloped area was condemned. There are several bits of testimony which are very significant. Hepler stated that in his opinion there was no likelihood that a well on the 100 acres would produce in paying quantities. When that statement was made, counsel for plaintiff objected, and counsel for defendants said:

"What I seek to show here is the likelihood. They have testified there are no dry holes, and I am seeking to show we have carried that production to the east as far as we can, and that other production would be negligible quantities."

On cross-examination, Hepler testified:

"Q. Then, as a matter of fact, you don't know but what you might drill one location from the Skelly well, and strike oil, do you? A. I know we are not going to spend $50,000 to find out. Q. You don't intend to do that? A. No, sir. Q. What do you mean? A. I mean we are not going to spend $50,000 to drill a well alongside of a dry hole. Q. Then, where do you contemplate drilling on this 100 acres? A. If the 100 acres looks as if it would justify it, we certainly would drill it. Q. How will you know if it will justify it until it is tried? A. There may be some undeveloped sands up in that country we know nothing of. Q. Then you are depending on others to find other sands before you go down on the 100 acres, is that true? A. No, not necessarily."

After the defense had rested and a night had intervened, the defense asked to reopen the case, and thereupon introduced Roy M. Johnson, an officer of the Fox Petroleum Company, who had previously been on the stand, and who at this time testified:

"Q. I will ask you to state to the court, if you know, the intention of the Fox Petroleum Company as to the future development of the property under litigation? A. When the price of oil justifies us, with the small production in that area of the field, we will do it, as it is our intention to do further drilling. We have discussed that with our partners, the Humble Oil & Refining Company, and they are willing to drill whenever the price of oil justifies."

Perhaps counsel may have reflected during the night that they were in a serious situation—that an intention to abandon might be inferred from the evidence they had introduced. There is nothing in the record to indicate that the lessees had planned, either themselves or in co-operation with owners of surrounding territory, to make further tests as to the possibilities of that territory, either on this lease or in the immediate vicinity. There is nothing that would indicate that they were delaying to observe what might develop with the wells already drilled. On the other hand, the interval between the completion of well No. 5, and the commencement of the suit, was only about six months. During that interval, one of the other wells had been deepened. Standing alone, this would not appear to be an unreasonable delay. It is in this connection that the proposition of notice or demand becomes important. It is doubtless true that there are cases in which demand and notice are vain things, and are not necessarily prerequisites to a suit for cancellation. Hitt v. Henderson, supra. In certain instances, the commencement of suit might answer as demand. Alford v. Dennis, supra. But the nature of the notice or demand, the circumstances under which it was given, and the representative character of the parties to whom it was given, all have some bearing in this particular case upon the question whether there had been an unreasonable delay. In these particulars the record is barren except as to certain conversations with named individuals whose official connection with the defendants is not

shown. These conversations seemed to have related to lessor's desire for further development. It is chiefly in determining the reasonableness and the equity of the position of the respective parties with reference to abandonment, that notice and demand became important.

There is almost expressed an intention to abandon the 100 acres as condemned—lessees have barely escaped abandonment. There is an attempt to explain the delay as caused by market conditions. The delay does not appear to have been unreasonable, and the evidence of demand by the lessors does not throw either light or shadow on the lessees' position. We are therefore of the opinion that the plaintiffs have not sustained the burden, and that the evidence does not establish abandonment. In so far as the judgment of cancellation is based on said incompetent evidence of express oral agreement to further develop the 100 acres, same is erroneous. Such judgment is clearly against the weight of the evidence if based on the implied covenants further to develop and on abandonment or on either ground.

Let the judgment be reversed, and the cause remanded, with directions to enter judgment for defendants.

By the Court: It is so ordered.